**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**MICHAEL TAPIA**,

      Plaintiff,

  vs.                              **CIV. NO.  02-695 MCA/RLP**

**THE CITY OF ALBUQUERQUE,** and
**CORRECTIONS OFFICER JASON GARCIA**,
and **CORRECTIONS OFFICER JIMMY PINON**,
in their individual and official capacities as
employees of the City of Albuquerque,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on *Defendants' Motion for Summary Judgment* [Doc. No. 90].  Having reviewed the submissions of the parties, the relevant law, and otherwise being fully advised in the premises, the Court finds that grounds exist for granting Defendants' motion in part as to Plaintiff's excessive force claims under 42 U.S.C. § 1983, and declining to exercise supplemental jurisdiction over Plaintiff's tort claims under state law.  Accordingly, summary judgment is granted as to Plaintiff's excessive force claims under 42 U.S.C. § 1983, and Plaintiff's tort claims under state law are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

**I.    BACKGROUND**

On June 17, 2002, Plaintiff Michael Tapia filed his *Complaint* [Doc. No. 1] in this Court against Defendants City of Albuquerque and John Does One through Six.  Plaintiff's *Complaint* alleged federal civil-rights violations, as well as tort claims under state law, arising from an incident at the Bernalillo County Detention Center (BCDC).  On February 12, 2003, the Court issued an *Order* [Doc. No. 37] granting the parties' *Joint Motion to Dismiss City of Albuquerque as Operator of Albuquerque Police Department and John Does One and Two* [Doc. No. 35].  Plaintiff then filed an unopposed motion to amend his complaint [Doc. No. 38], which the Court granted on March 14, 2003 [Doc. No. 41.] Plaintiff filed his *First Amended Complaint* [Doc. No. 42] on March 19, 2003, adding Corrections Officers Jason Garcia and Jimmy Pinon as Defendants.

Plaintiff's *First Amended Complaint* asserts that Defendants Garcia and Pinon violated Plaintiff's federal constitutional right to be free of unreasonable force while detained.  The *First Amended Complaint* also asserts that Defendants Garcia, Pinon, and the City of Albuquerque are liable under state law for the tort of battery, and that the City of Albuquerque also is liable under state law for the tort of negligent operation of BCDC.

*Defendants' Motion for Summary Judgment* [Doc. No. 39] was filed on March 13, 2003, in anticipation of the claims presented in the *First Amended Complaint*.  The undisputed facts and evidence of record that are relevant to Plaintiff's excessive force claims can be summarized in the light most favorable to Plaintiffs as follows.

On the evening of November 12, 2000, Plaintiff was taken into protective custody by Albuquerque Police Officer Nick Kraemer after an incident at Plaintiff's residence in which Plaintiff threatened to commit suicide and pretended to stab himself with a kitchen knife in the presence of his spouse. Officer Kraemer initially transported Plaintiff to a local hospital, where his blood-alcohol level was measured at .096 percent. The hospital personnel then instructed Officer Kraemer to take Plaintiff to BCDC and gave the officer some paperwork to deliver to the jail personnel at BCDC. (Kraemer Dep. at 34-44; Ex. M. to Pltf.'s Resp.)

After receiving these instructions, Officer Kraemer explained to Plaintiff that he was not under arrest but that he would need to go down to the jail until he sobered up. Pursuant to standard operating procedure, Plaintiff was handcuffed while he was transported to BCDC in the back of Officer Kraemer's police vehicle. When they arrived at BCDC, Officer Kraemer took Plaintiff to the intake area of BCDC, which consists of a wide hallway with an entrance and holding cells on one side and a "booking" counter approximately four feet high on the other side. (Kraemer Dep. at 42-48, 62.)

This area is monitored by video cameras, and the parties have submitted two exhibits consisting of videotape recordings that show, from three different angles, what transpired while Plaintiff and Officer Kraemer were present in the intake area. (Ex. 5 to Def.'s Mem. [Doc. No. 49]; Ex. O to Pltf.'s Resp. [Doc. No. 48].) These videotape recordings were filmed in black and white and have no sound. Nevertheless, with the aid of the descriptions provided in the deposition testimony submitted with the parties' briefs, and by reviewing

portions of the videotapes frame by frame in slow motion, the following events can be discerned.

When they arrived at the intake area, Officer Kraemer removed the handcuffs from Plaintiff, and both Plaintiff and the officer approached the booking counter. At that location, Officer Kraemer instructed Plaintiff to remove items of personal property (including his belt) from his clothing and place them in a bag so they could be inventoried. Officer Kraemer then turned Plaintiff over to Defendant Garcia, a BCDC Corrections Officer, so that Defendant Garcia could perform a pat-down search. (Kraemer Dep. at 42, 58-59; Garcia Dep. at 25.)

In order to perform the pat-down search, the corrections officers require detainees to place their hands on the booking counter. At the time they perform this search, the corrections officers generally are not aware of the reasons why a particular detainee is in custody or what events transpired before the detainee was brought into BCDC's intake area. In this case, there is no evidence that Defendants Garcia or Pinon knew at the time of the pat-down search that Plaintiff was in protective custody as a result of a suicide attempt. (Garcia Dep. at 18-19, 24-25, 33; Pinon Dep. at 27; Vigil Dep. at 14-16, 43-44; Zilink Dep. at 18.)

Plaintiff's deposition testimony provides an account of his conversation with the officers at the booking counter. According to this account, Plaintiff asked the officer, "Am I being charged with anything?" The officer responded, "No, we're going to keep you here." By his own admission, Plaintiff then became arrogant and angry. He made statements such as: (1) "Well, this is messed up"; (2) "You guys have no right to be having me here"; (3)

"Well, you guys are going to respect me"; and (4) "I make more money than all you guys. You guys are in a dead-end, loser job. You guys couldn't find nothing better." One of the officers responded to these statements by telling Plaintiff to "shut up." In reply, Plaintiff told him, "You just shut up. Why don't you shut up." (Tapia Dep. at 79-80.) According to Plaintiff, the officers initiated a physical altercation with him after he made these statements. (Tapia Dep. at 80.)

The videotapes and deposition testimony indicate that just prior to this altercation, Plaintiff was standing with his clasped hands and forearms resting on top of the booking counter. Defendant Garcia was directly behind Plaintiff. Officer Kraemer stood on Plaintiff's right side, and another officer, Sergeant Jonathan Thomas, was behind the booking counter facing Plaintiff. As Defendant Garcia placed his hands on Plaintiff's back to begin the pat-down search, Plaintiff moved back away from the counter toward Defendant Garcia. Defendant Garcia responded by placing his right hand on the back of Plaintiff's neck and pushing Plaintiff's head down on the counter in front of him. Plaintiff remained with his torso bent over and his face down on the booking counter for approximately two minutes. (Ex. 5 to Def.'s Mot.; Ex. O to Pltf.'s Resp.; Garcia Dep. at 28; Kraemer Dep. at 59-61; Pinon Dep. at 16; Tapia Dep. at 80-83; Thomas Dep. at 41-47; Vigil Dep. at 32-33.)

When Plaintiff's head reached the counter, Sergeant Thomas put one of his hands on Plaintiff's jaw and his other hand on Plaintiff's neck in order to keep Plaintiff's head down on the counter. Meanwhile, Defendant Garcia was in the process of securing Plaintiff's hands so they could be placed behind his back and handcuffed. During this process,

-5-

Defendant Garcia can be seen thrusting his right elbow at the left side of Plaintiff's back as he is trying to leverage and gain control of Plaintiff's left arm with his left hand. Defendant Garcia eventually succeeded in positioning both of Plaintiff's hands behind Plaintiff's back so that Plaintiff could be handcuffed. (Ex. O to Pltf.'s Resp.; Garcia Dep. at 28; Tapia Dep. at 83-84.)

Defendant Pinon's involvement in the altercation began when Sergeant Thomas called him over to assist in handcuffing Plaintiff and bringing the leg irons. Another Corrections Officer, Francine Vigil, also assisted in putting the leg irons on Plaintiff's legs. (Ex. 5 to Def.'s Mem.; Pinon Dep. at 16-17, 24; Tapia Dep. at 85-86; Vigil Dep. at 33.) After Plaintiff was restrained in handcuffs and leg irons, Defendants Garcia and Pinon held onto his arms and escorted him toward a holding cell. During this escort, Plaintiff took a few steps and then dropped his feet or lost his footing. He began to fall toward the ground. Before Plaintiff reached the ground, Defendants Garcia and Pinon pulled him up and carried him by his arms into the holding cell. (Ex. 5 to Defs.' Mem.; Garcia Dep. at 42-43; Pinon Dep. at 25-26.)

According to one of the videotapes, Defendants Garcia and Pinon were in the holding cell with Plaintiff for approximately four seconds. A portion of Defendant Pinon's body is partially visible in the doorway of the holding cell during this entire period. (Ex. 5 to Defs.' Mem.) During this time, Plaintiff contends that the officers threw him onto the floor of the holding cell, and then one of them slapped him in the face, spit on him, and called him a

"Spic." (Tapia Dep. at 86-90.) Defendants deny these contentions and claim that Plaintiff was simply placed in the cell in a sitting position. (Garcia Dep. at 42; Pinon Dep. at 25.)

A log kept by BCDC contains the following entry: "2130 . . . Inmate Tapia, Michael being uncooperative with initial search, placed in hand-restraints double locked, for his own protection and safety (15 Min Checks)." A subsequent log entry reads: "2200 ... Restraints removed from Inmate Tapia, Michael in Cell#4." (Ex. L. to Pltf.'s Resp.) After several hours in detention, Plaintiff spoke to a counselor and was released from BCDC.

The next day Plaintiff sought medical attention. His medical records indicate that on November 30, 2001, he was diagnosed with a neck contusion, fatigue and malaise, and depression. The medical records for that date further indicate that "[h]e does have some bruises and scabs on the left side of his neck," and that "[t]here is some tenderness over the ribs on the left flank but no bruising seen." (Ex. H to Pltf.'s Resp.)

## II. ANALYSIS

### A. Standard of Review

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed. R. Civ. P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts

showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct. See Medina v. Cram, 252 F.3d 1124, 1128-29 (10th Cir. 2001); Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001). If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity. See Gross, 245 F.3d at 1156. If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's

summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See id.

### B. Plaintiff's Excessive Force Claims under 42 U.S.C. § 1983

42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Persons sued in their individual capacity under this federal civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue. See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

In this case, Plaintiff's *First Amended Complaint* alleges that Defendants Garcia and Pinon violated his right "to be secure in his person against unreasonable force." [Doc. No. 42.] The alleged violation occurred while Plaintiff was detained without a warrant and before he was brought before a judicial officer for a determination of probable cause.

Accordingly, his excessive force claims "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." Graham v. Connor, 490 U.S. 386, 388 (1989); see Frohmader v. Wayne, 958 F.2d 1024, 1026 (10th Cir. 1992).

This Fourth Amendment standard is incorporated in the Fourteenth Amendment, which applies to state actors such as Defendants Garcia and Pinon. See Mapp v. Ohio, 367 U.S. 643, 655 (1961). Thus, Plaintiff's claims are properly analyzed under the Fourth Amendment "objective reasonableness" standard even though the *First Amended Complaint* refers to the Fourteenth Amendment rather than the Fourth Amendment.

When, as here, a defense of qualified immunity is raised by an individual Defendant in the context of the Fourth Amendment's "objective reasonableness" standard, the Court applies two distinct standards of reasonableness. First, in determining whether an individual defendant's actions violated a specific right, the Court must decide whether the defendant's use of force to effect a seizure was "unreasonable" under the Fourth Amendment. Second, if such a violation is found, then in determining whether the constitutional right at issue was clearly established at the time of the search or seizure, the Court must answer the additional question of whether the contours of the right were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); accord Saucier v. Katz, 533 U.S. 194, 203-04 (2001).

The subjective intentions or state of mind of the Plaintiff or the individual Defendants are not relevant to determining whether a search or seizure is executed in a manner that is

objectively reasonable under the Fourth Amendment.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001); United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).  Rather, "the reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions."  Medina, 252 F.3d at 1131 (quoting Graham, 490 U.S. at 396-97).

This assessment must be "based upon the information the officers had when the conduct occurred."  Saucier, 533 U.S. at 207.  "[R]elevant factors include the crime's severity, the potential threat posed by the suspect to the officer and others' safety, and the suspect's attempts to resist or evade arrest."  Id.

The first of these factors does not carry much weight in this case because Defendants Garcia and Pinon did not have reason to know why Plaintiff was in custody or what transpired before he entered the intake area of BCDC.  The incident at the booking counter occurred before there was sufficient time for these Defendants to review the documentation that Officer Kraemer had brought with him from the hospital.  When this incident occurred, the individual Defendants had not even completed the initial step in their intake procedure, which was to conduct a pat-down search of the detainee.  Thus, the only reasonable inference that they could have drawn about the severity of the crime was that Plaintiff may have done something sufficiently serious to warrant his temporary detention at BCDC.

This uncertainty about the reasons for Plaintiff's presence at BCDC takes on greater significance, however, in assessing the potential threat that Plaintiff posed to the individual

Defendants and others' safety. The intake area of BCDC is a stressful, uncertain environment where corrections officers must search and book a sizeable volume of detainees with little or no advance warning of the circumstances which led to their detention, or whether they may be concealing weapons or contraband. This is the type of environment in which officers may be "forced to make split-second judgments," Graham, 490 U.S. at 396-97, based solely on their own short-term observations of a detainee's statements and behavior.

A detainee's attempt to resist the officer's commands is an especially relevant factor in assessing the reasonableness of the officer's conduct under these circumstances. In this case, Plaintiff admits that he behaved arrogantly and angrily in the moments leading up to the use of force by Defendants Garcia and Pinon. He also admitted that when an officer told him to "shut up," he openly defied officers' verbal command by stating, "you shut up." Further, the videotapes of the incident show that Plaintiff was not assuming the position taken by other detainees during the pat-down search. Rather, he remained standing with his clasped hands and forearms resting on the booking counter, and then he moved back towards Defendant Garcia as Defendant Garcia attempted to begin the pat-down search. While it is possible that Plaintiff did not subjectively intend to pose a threat to anyone at that time, the officers could reasonably (albeit mistakenly) infer from his behavior that he was attempting to resist the pat-down search. Such resistance weighs heavily in favor of Defendants' contention that the use of force was reasonable. See Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993).

The Court's assessment of the reasonableness of Defendants' conduct also must include consideration of the degree of force actually used. See generally Tenn. v. Garner, 471 U.S. 1, 8-9 (1985); Martin v. Bd. of County Comm'rs, 909 F.2d 402, 407 (10th Cir. 1990). In this regard, individuals are not necessarily required to show that they suffered physical injury in order to establish a prima facie case of excessive force. See Holland v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001). "[T]he interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests--a person's 'sense of security' and individual dignity." Id.

On the other hand, it is reasonable to expect that these interests are diminished or outweighed to a significant degree when a person is lawfully detained by a police officer and taken to a detention facility. See generally Bell v. Wolfish, 441 U.S. 520, 546-47 (1979). "In making an arrest, officers may 'use some degree of physical coercion or threat thereof to effect it.'" Gross, 245 F.3d at 1158 (quoting Graham, 490 U.S. at 396). "For example, in order to position an arrestee for a pat down search for weapons, officers frequently use a reasonable amount of force." Id. Even when an officer uses "more force than in fact was needed" to accomplish such a search or arrest, the officer remains entitled to qualified immunity if he or she "reasonably, but mistakenly, believed that a suspect was likely to fight back." Saucier, 533 U.S. at 205.

Defendant Garcia's use of force in this case began in the context of positioning Plaintiff for a pat down search while Plaintiff was lawfully detained in the intake area of

BCDC. Given the uncertain, stressful nature of this environment, in combination with the admitted and observable behavior of Plaintiff that could reasonably (albeit mistakenly) be interpreted as an attempt to fight back or resist the search, the Court concludes that Defendant Garcia is entitled to qualified immunity with respect to the force he used in pushing Plaintiff's head onto the booking counter, securing Plaintiff's hands, and holding Plaintiff in that position for approximately two minutes while Plaintiff was placed in handcuffs and leg irons.

      The Court notes that at the time that Defendant Garcia thrust his right elbow at the left side of Plaintiff's back, Defendant Garcia was attempting to leverage and gain control of Plaintiff's left arm so that Plaintiff could be handcuffed. Thus, the purpose of the elbow thrust reasonably relates to the legitimate objective of securing Plaintiff in handcuffs. In addition, a medical examination the next day revealed no bruises on that area of Plaintiff's back. (Ex. H to Pltf.'s Resp.) Rather, the scabs and bruises referenced in Plaintiff's records correspond to the neck area that Sergeant Thomas (who is not a defendant) was holding at the time Plaintiff was restrained at the booking counter. (Ex. O to Pltf.'s Resp.) Thus, while Defendant Garcia's actions may come close to the "sometimes hazy border between excessive and acceptable force,'" Saucier, 533 U.S. at 206 (quoting Priester v. Riviera Beach, 208 F.3d 919, 926-27 (11th Cir. 2000), they are not sufficiently egregious to survive qualified immunity when viewed in context of a lawful, pat-down search in the intake area of a detention facility, during which an officer "reasonably, but mistakenly, believed that a suspect was likely to fight back." Saucier, 533 U.S. at 205.

The videotape evidence and deposition testimony indicates that Defendant Pinon's only involvement in the altercation at the booking counter was to assist in restraining Plaintiff in handcuffs and leg irons. Thus, Defendant Pinon also is entitled to qualified immunity with respect to his conduct at the booking counter.

Finally, the Court concludes that Defendants Garcia and Pinon are both entitled to qualified immunity with respect to the force they used in moving Plaintiff from the booking counter and placing him in the holding cell. While it is possible that Plaintiff simply lost his footing by accident as the officers escorted him to the holding cell, the officers could reasonably (albeit mistakenly) have interpreted this behavior as an attempt at resistance. Further, the videotape evidence shows that, after he lost his footing, Plaintiff was carried into the holding cell by his arms in a manner that is analogous to the procedure employed in Saucier, 533 U.S. at 198. Recognizing that "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment,'" the Supreme Court determined that officers utilizing this procedure in similar circumstances were entitled to qualified immunity. Id. at 209 (quoting Graham, 490 U.S. at 396). Accordingly, the Court reaches the same conclusion in this case.

Plaintiff has alleged no further use of force by Defendants Garcia or Pinon that is sufficiently egregious to be of constitutional dimensions when the totality of the circumstances are considered. To the extent that the force employed by these Defendants was excessive, such an error was a reasonable mistake under the particular circumstances of this case. See Saucier, 533 U.S. at 206. "The concern of the [qualified] immunity inquiry

is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." Id. at 205.  This concern weighs in favor of granting qualified immunity to the individual Defendants on all of Plaintiff's excessive force claims.

Plaintiff's *First Amended Complaint* does not expressly assert any municipal liability claims asserted against Defendant City of Albuquerque under 42 U.S.C. § 1983.  In addition, Defendants point out in their summary-judgment motion that Plaintiff has not presented sufficient evidence to support each element of a claim for municipal liability under that federal statute.  Thus, to the extent that any claims for municipal liability are asserted under 42 U.S.C. § 1983 in this matter, Defendant City of Albuquerque is entitled to summary judgment on those claims.  See generally Jojola v. Chavez, 55 F.3d 488, 491 (10th Cir. 1995); Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999).

### C.     State Law Claims

Defendants assert that they also are entitled to summary judgment on Plaintiff's tort claims of battery and negligent operation of a detention facility.  These claims arise under the New Mexico Tort Claims Act, and this Court does not have original jurisdiction over them. Rather, these state-law claims are before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).

"The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Having granted summary judgment on Plaintiff's excessive force claims under 42 U.S.C. § 1983, the Court declines to exercise

supplemental jurisdiction over Plaintiff's state law claims. See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction. See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995). The Court is not convinced that these factors weigh in favor of retaining jurisdiction. In this regard, the Court finds that Plaintiff's state-law claim of negligent operation of a detention facility "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary. See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990). In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Plaintiff's state-law claims, as 28 U.S.C. § 1367(d) provides for the tolling of any limitations period regarding these claims.

### III.  CONCLUSION

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's excessive force claims brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment. In light of this conclusion, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion for Summary Judgment* [Doc. No. 90] is **GRANTED IN PART** as to Plaintiff's excessive force claims under 42 U.S.C. § 1983 and the Fourteenth Amendment**.**

**IT IS FURTHER ORDERED** that Plaintiff's state-law tort claims of battery and negligent operation of a detention facility are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c).

**SO ORDERED**, this 2nd day of June 2003, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
*United States District Judge*